# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 4, 2013

No. 12-50357

Lyle W. Cayce
Clerk

TOM AMROLLAH, also known as Mohammad Hassan Amrollah-Majdabadi,

Plaintiff - Appellant

v.

JANET NAPOLITANO, SECRETARY, DEPARTMENT OF HOMELAND
SECURITY; ALEJANDRO MAYORKAS, Director of Citizenship and
Immigration Services; GERARD HEINAUER, Director of the Nebraska
Service Center for Citizenship and Immigration Services; ROBERT
MUELLER, Director of the Federal Bureau of Investigation; ERIC H.
HOLDER, JR., U.S. ATTORNEY GENERAL,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before STEWART, Chief Judge, and DAVIS and CLEMENT, Circuit Judges.
EDITH BROWN CLEMENT, Circuit Judge:

Tom Amrollah fled Iran in 1998 for the United States with his wife and
two children.  After receiving a grant of asylum, Amrollah and his family filed
an application to obtain lawful permanent residence status with the United
States Citizenship and Immigration Services ("USCIS").  Ten years later, USCIS
denied Amrollah's application.  Amrollah filed suit in the Western District of
Texas seeking relief under the Administrative Procedures Act ("APA") and the

No. 12-50357

Declaratory Judgment Act. The parties filed cross-motions for summary judgment and the district court granted judgment in favor of the government. For the following reasons, we REVERSE.

## FACTS AND PROCEEDINGS

Tom Amrollah (formerly known as Mohammad Hassan Amrollah-Majdabadi) is a citizen and national of Iran. In 1979, Amrollah was working as a pharmacist in Iran when he began providing medical assistance in the form of prescription medications and bandages to the mujahedeen movement.[1] Amrollah never formally joined the mujahedeen, but he was arrested for his support of the movement in 1982, and sentenced to a year in prison and 30 lashes. Upon his release from prison, Amrollah continued to support the movement by providing prescriptions as well as money for printing pamphlets. In 1996, Amrollah was arrested a second time and sentenced to six months in prison. He claims that this was the last time he provided any support to the mujahedeen movement.

Two years after his 1996 arrest, Amrollah once again received a subpoena to appear before an Iranian religious court. In response, Amrollah, his wife, and their two children decided to flee Iran for the United States, entering near Eagle Pass, Texas on July 8, 1998. Amrollah admitted to entering the country illegally, but sought asylum on the basis of his persecution in Iran. Amrollah acknowledged his support of the mujahedeen movement in his petition and in an asylum hearing before the Immigration Judge ("IJ"). The IJ granted

---

[1] The government contends that the mujahedeen movement is indistinguishable from Mojahedin-e-Khalq ("MeK"), a revolutionary Iranian organization. The United States Department of State designated MeK a Tier I Foreign Terrorist Organization in 1997, but this designation was lifted on September 28, 2012, after multiple appeals from MeK that it had disarmed and been non-violent since at least 2003. The government argues that regardless of this de-designation, the mujahedeen movement qualified as a Tier III terrorist organization during the time that Amrollah provided support. As discussed below, we need not reach this question.

No. 12-50357

Amrollah and his family asylum, noting that he found Amrollah to be generally credible and that "[a]lthough the Service attorney hints, or hinted that Respondent's support of the Mujahedeen indicated violent activity which might disqualify the Respondent from being eligible for asylum," the IJ "conclude[d] that Respondent's testimony showed he did not commit any violent act," and that he was therefore eligible for asylum under 8 U.S.C. § 1158. The government did not appeal this decision.

One year later, Amrollah and his family applied for lawful permanent residence status. His children's applications were approved in 2004 and 2005, but Amrollah and his wife's applications remained pending until 2009. Amrollah filed his original complaint on December 1, 2009, seeking a writ of mandamus to compel agency action on his and his wife's applications. The government proceeded to grant Amrollah's wife's application, but denied Amrollah's application without a hearing, based on the support he had provided to the mujahedeen movement.

Amrollah filed an amended complaint, arguing that the government wrongly denied his application for permanent residence status and requesting relief under the APA, 5 U.S.C. §§ 704 and 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201(a). The district court found that the agency's decision was supported by substantial evidence and that collateral estoppel did not bar USCIS from denying Amrollah's application. Amrollah timely appealed.

**STANDARD OF REVIEW**

This court reviews a grant of summary judgment *de novo*, applying the same standards as the district court. *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 774 (5th Cir. 2010). The APA "allows a federal court to overturn an agency's ruling 'only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole.'" *Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 753 (5th

Cir. 2011) (quoting *Tex. Clinical Labs*, 612 F.3d at 775); *see also* 5 U.S.C. § 706(2)(A). Courts start from "a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous." *Bd. of Miss. Levee Comm'rs v. EPA*, 674 F.3d 409, 417 (5th Cir. 2012) (quoting *Buffalo Marine*, 663 F.3d at 753).

## DISCUSSION

Amrollah received his grant of asylum in 1999 under 8 U.S.C. § 1158, which permits refugees to seek asylum when "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). This statute also prohibits the government from granting asylum to aliens who participate in terrorist activity as defined by 8 U.S.C. § 1182(a)(3)(B)(i) or 8 U.S.C. § 1227(a)(4)(B), including aliens who provide material support to any individual, organization, or government conducting terrorist activity. *Id.* at § 1158(b)(2)(A)(v) (1999); *see also id.* at § 1182(a)(3)(B)(iii)(III) (1999) (discussing the prohibition against material support).

An alien who has been granted asylum is eligible for an adjustment in status to that of permanent resident if, after being physically present in the United States for at least one year, he is otherwise "admissible . . . as an immigrant under this chapter at the time of examination for adjustment." *Id.* at § 1159(a)(2)(b). Aliens who engage in terrorist activities, as defined under the same statute used in asylum proceedings, are not admissible. *See id.* at § 1182(a)(3)(B)(i)(I). In other words, both 8 U.S.C. § 1158 (the statute governing petitions for asylum) and 8 U.S.C. § 1159 (the statute governing petitions for permanent resident status), look to 8 U.S.C. § 1182 (the statute governing inadmissible aliens) to determine whether an alien is eligible for relief.

No. 12-50357

The government denied Amrollah's application for permanent resident status after it concluded that Amrollah had engaged in terrorist activity under 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd) (2010) by providing material support to a Tier III terrorist organization or the member of such an organization. Amrollah argues that the government was collaterally estopped from finding that he engaged in terrorist activity under this statute, because his grant of asylum necessarily included a determination that he did not provide material support to a terrorist organization or member of such organization. We agree.

A final decision by an immigration judge has a preclusive effect on future litigation and agency decisions. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 107-08 (1991); *Medina v. INS*, 993 F.2d 499, 503-04, 503 n.15 (5th Cir. 1993). Issue preclusion, also known as collateral estoppel, applies when "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary to the decision." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005) (en banc).

Prongs two and three of this test are easily satisfied. The government cross-examined Amrollah extensively about his support of the mujahedeen movement and MeK during the asylum proceeding. In addition, as explained above, the immigration judge was *not permitted* to grant asylum to Amrollah if he satisfied any of exceptions to admissibility under § 1182, including providing material support to any individual or organization that engaged in terrorist activities. 8 U.S.C. § 1158(b)(2)(A)(v) (1999) (stating that an alien is not admissible for asylum if "the alien is described in subclause (I), (II), (III), (IV), or (VI) of section 1182(a)(3)(B)(i) of this title"). In other words, the IJ's ruling that Amrollah was admissible necessarily included, under the structure of the statute, a finding that Amrollah did not provide support to an individual or organization that engaged in terrorist activities.

No. 12-50357

Nevertheless, "relitigation of an issue is not precluded unless the facts and the legal standard used to assess them are the same in both proceedings." *Pace*, 403 F.3d at 290. The government did not hold a hearing prior to denying Amrollah's petition for adjustment in status or present any additional facts which would make the IJ's ruling distinguishable. However, "[i]ssues of fact are not 'identical' or 'the same,' and therefore not preclusive, if the legal standards governing their resolution are 'significantly different,'" *Pace*, 403 F.3d at 290 (quoting 18 JAMES WM. MOORE ET AL., MOORE'S FED. PRACTICE 132.02[2][h] (3d ed. 2001)), or create a "demonstrable difference" in legal standards. *Talcott v. Allahabad Bank, Ltd.*, 444 F.2d 451, 459 n.8 (5th Cir. 1971). The question presented in this appeal is whether the definition of "engag[ing] in terrorist activity" under the 2010 version of the statute is "significantly different" or creates a "demonstrable difference" from the standard in place in 1999, sufficient to preclude collateral estoppel.

The government argues, and the district court held, that collateral estoppel does not apply to Amrollah's petition because the statute governing the admissibility of aliens was altered by, among other things, passage of the USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2011).[2] In April 1999, when Amrollah petitioned for asylum, "engaging in terrorist activity" was defined as follows:

> [T]o commit, in an individual capacity or as a member of an organization, an act which the actor knows, or reasonably should know, *affords material support to any individual, organization, or government in conducting a terrorist activity at any time*, including . . . [t]he providing of any type of material support, including a safe house, transportation, communications, funds, false documentation

---

[2] Although this statute was passed after Amrollah filed his petition for permanent resident status, it is retroactive to "actions taken by an alien before, on, or after such date." Pub. L. No. 107-56, §411(c)(1). Furthermore, 8 U.S.C. § 1159(b) looks to whether an alien is admissible "at the time of examination for adjustment" of status, which in this case was in 2010.

or identification, weapons, explosives, or training, *to any individual the actor knows or has reason to believe has committed or plans to commit a terrorist activity*.

8 U.S.C. § 1182(a)(3)(B)(iii) (1999) (emphasis added).    When Amrollah's application for adjustment in status was finally adjudicated in 2010, the definition of "engaging in terrorist activity" was defined as:

> [I]n an individual capacity or as a member of an organization . . . to commit an act that the actor knows, or reasonably should know, *affords material support*, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training. . . *to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity . . . or to a terrorist organization described in clause (vi)(III), or to any member of such an organization* unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization.

8 U.S.C. § 1182(a)(3)(B)(iv) (2010) (emphasis added).

By finding Amrollah admissible to the United States in 1999, the immigration judge necessarily decided that Amrollah did not afford material support to any: (i) individual, (ii) organization, or (iii) government in conducting a terrorist activity at any time.  The government argues on appeal that Amrollah is inadmissible under the expanded 2010 statute for providing material support to a Tier III terrorist organization—defined as  "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup that engages in" terrorist activity.  8 U.S.C. § 1182(a)(3)(B)(vi)(III) (2010). Although the government's claim could be successful under different circumstances, as applied to Amrollah, this proscription does not provide a separate and distinct

ground upon which the government can now deny his application.[3]  Under a plain reading of the text of the statute and the facts of this case, the IJ's 1999 finding that Amrollah did not provide material support to *any* "individual" *or* "organization" in conducting a terrorist activity has a preclusive effect against a subsequent finding that Amrollah provided material support to "a group of two or more individuals" engaged in terrorist activity.  The government has provided this court with no reason, whether by legislative history or any other source, to reject this reading.

Because the government has not demonstrated a significant change in the law between 1999 and 2010 as applied to Amrollah's petition for permanent resident status, USCIS is collaterally estopped from concluding that Amrollah is ineligible for an adjustment to permanent resident status on the basis of his provision of support to the mujahedeen movement.  USCIS's denial of Amrollah's application is set aside under 5 U.S.C. § 706.

## CONCLUSION

We REVERSE the decision of the district court granting summary judgment to defendants, RENDER summary judgment for Amrollah, and REMAND this case to the agency for proceedings not inconsistent with this opinion.

---

[3] Although it would not significantly alter the analysis, we note that the government does not argue, nor does the record support, that Amrollah qualified for asylum because he did not know or have reason to believe that the organization he supported had committed or planned to commit a terrorist activity.